UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------x
                              :
UNITED STATES OF AMERICA      :    S4 05 Cr. 673 (LAP)
                              :
          -v.-                :    <u>OPINION AND ORDER</u>
                              :
RAFIQ SABIR                   :
     a/k/a "the Doctor,"      :
                              :
               Defendant.     :
                              :
-----------------------------x

LORETTA A. PRESKA, U.S.D.J.

     Defendant Rafiq Sabir, a/k/a the Doctor, is charged as
part of a four-count fourth superseding indictment (the
"Indictment") with conspiring to provide, and with
attempting to provide, material support or resources to the
al Qaeda foreign terrorist organization, in the form of
"medical support to wounded jihadists," in violation of 18
U.S.C. § 2339B.  Trial began on April 25, 2007.[1]

---

[1] The Court presumes familiarity with its prior written
decision in this matter.  <u>See</u> <u>United States v. Shah</u>, 474 F.
Supp. 2d 492 (S.D.N.Y. 2007).  Sabir's three co-defendants
have now plead guilty.  On November 9, 2006, Abdulrahman
Farhane, a/k/a Abderr Farhan, plead guilty to a two-count
third superseding information charging him with
participating in a conspiracy to commit money laundering by
sending money from the United States to "locations overseas
to purchase weapons and communications equipment for
jihadists in Afghanistan and Chechnya" in violation of 18
U.S.C. § 371 and making materially false statements to law
enforcement officials in violation of 18 U.S.C.
§ 1001(a)(2).  On April 16, 2007, Mr. Farhane was sentenced
to 13 years in prison.  On April 2, 2007, Mahmud Faruq
                                        (continued)

At a conference held on April 17, 2007, the Court heard oral argument on Dr. Sabir's motion in limine to introduce psychological expert testimony from Dr. Hope Hill.  At a conference held on April 20, 2007, the Court heard oral argument on Dr. Sabir's motion in limine to preclude expert testimony on al Qaeda from Evan Kohlmann. Given the proximity to trial and the parties' need to prepare sufficiently in advance thereof, the Court issued its rulings to preclude the testimony of Dr. Hill and to permit the testimony of Dr. Kohlmann from the bench at the conclusion of those conferences.  This written decision now follows.

---

(continued)
Brent, a/k/a Mahmud Al Mutazzim, plead guilty to Count Three of the Indictment charging him with conspiring to provide material support or resources to the Lashkar-e-Taiba foreign terrorist organization, in the form of "travel[ing] to and attend[ing] a Lashkar-e-Taiba terrorist training camp in Pakistan," in violation of 18 U.S.C. § 2339B.  On April 4, 2007, Tarik Ibn Osman Shah, a/k/a "Tarik Shah," a/k/a "Tarik Jenkins," a/k/a "Abu Musab," plead guilty to Count One of the Indictment charging him with conspiring with Dr. Sabir and others to provide material support or resources to al Qaeda, in the form of "martial arts training and instruction for jihadists," in violation of 18 U.S.C. § 2339B.  Mr. Brent and Mr. Shah are scheduled to be sentenced on July 10, 2007.

BACKGROUND

1.   Dr. Hill's Proffered Expert Testimony

On March 31, 2007, Dr. Sabir filed a motion in limine to obtain the Court's permission in advance of trial to introduce expert testimony from Dr. Hill.  In that submission, Edward D. Wilford, counsel for Dr. Sabir, described the testimony offered as bearing on "choices of association" that he likened to expert testimony concerning an organization in a racketeering or narcotics trial.  (Dr. Hill Notice at 1; Dr. Hill Mem. at 2).[2]  In addition, Mr. Wilford stated that the purpose of Dr. Hill's testimony would be to negate the intent elements of the crimes charged.  (Dr. Hill Notice at 1).  Specifically, Mr. Wilford indicated that Dr. Hill would testify about "[r]isk factors and how [they] impacted on Dr. Sabir's inability to formulate the intent necessary to provide material support to [a]l Qaeda" and "[h]ow the life history of Dr. Sabir impacted his ability to formulate intent."  (Id.).

On April 15, 2007, Mr. Wilford further described the expected testimony of Dr. Hill to be, in essence, that Dr. Sabir made bad decisions in his adult life because of

_____

[2] "Dr. Hill Notice" refers to Mr. Wilford's letter to Karl Metzner, Assistant United States Attorney, dated March 31, 2007.  "Dr. Hill Mem." refers to Mr. Wilford's letter to the Court dated March 31, 2007.

negative childhood experiences, particularly his lack of a
father figure and the mental illness of his mother.  (Dr.
Hill Reply Mem. at 1-2).[3]  These "poor decisions," according
to Mr. Wilford's supplemental proffer, resulted in a
"pattern of self sabotage" that made Dr. Sabir "vulnerable
to his current association with Tarik Shah as he grew to
see Shah as the brother and father figure he never had
. . . [resulting in] a relationship which proved to be
disastrous."  (Id.).  In contrast to his original proffer,
Mr. Wilford did not state in his reply submission that Dr.
Hill would testify concerning Dr. Sabir's ability to form
the requisite intent to commit the crimes charged.  (Id.).

     The Government opposed the introduction of Dr. Hill's
testimony primarily on two grounds.  First, the Government
contended that "the type of testimony now offered is
completely inadmissible, as it is not mental state
testimony related to [Dr.] Sabir's intent to commit the
crimes with which he is charged, but is instead . . . an
attempt merely to justify or excuse [Dr.] Sabir's actions."
(Dr. Hill Opp'n Mem. at 2).[4]  Second, the Government

_____

[3] "Dr. Hill Reply Mem." refers to Mr. Wilford's letter to
Mr. Metzner dated April 15, 2007.

[4] "Dr. Hill Opp'n Mem." refers to the "Government's
Memorandum in Law in Opposition to Defendant Rafiq Sabir's
                                        (continued)

asserted that, even if Dr. Hill's testimony was relevant, "the type of evidence proffered should be excluded as it would not be helpful to the trier of fact, would tend to be confusing to the jury, and is, at bottom, a blatant attempt to gain sympathy from the jury and to get [Dr.] Sabir's life story before the jury without [his] having to testify himself." (Id.).  In particular, the Government asserted during oral argument that there is even greater concern for confusion to the jury here, where specific intent is not an element of the substantive offense charged in Count Two of the Indictment.  (Transcript of Oral Argument, dated April 17, 2007, at 26/20-27/12 ("So you have one specific intent crime, one general intent crime, or a knowledge crime that is not a specific intent crime, and you are asking the jury to potentially apply this testimony to one and not the other.")).

At oral argument, Mr. Wilford conceded that Dr. Hill's proffered testimony does not purport to address whether Dr. Sabir had the mental capacity to form the requisite intent to commit the charged crimes.  (Id. at 17/9-10; 23/8-13). That is why, according to Mr. Wilford, he did not serve a notice pursuant to Rule 12.2 of the Federal Rules of

---

(continued)
Motion to Introduce Expert Testimony Regarding His Mental State," filed on April 16, 2007.

Criminal Procedure placing Dr. Sabir's mental state in issue. (Id. at 17/3-8; 23/8-13). Indeed, Mr. Wilford admitted that Dr. Sabir had the mental capacity to form the requisite intent. (Id. at 23/22-23; 25/15-18).

Rather, Mr. Wilford asserted that Dr. Hill's proffered testimony would support an "alternative explanation for what happened." (Id. at 17/13-14). According to Mr. Wilford, this "alternative explanation" would provide jurors with a "framework to make [the] decision" of whether Dr. Sabir intended to commit the charged offenses rather than invite them to commit jury nullification. (Id. at 24/10-22). Mr. Wilford conceded that Dr. Sabir can, of course, testify to this effect and represented that he will do so at trial. (Id. at 17/13-18). However, according to Mr. Wilford, jurors are less likely to believe this testimony without the elaboration and amplification that Dr. Hill's proffered testimony can provide by grounding it in scientific knowledge and terminology. (Id. at 24/1-4).

Finally, Mr. Wilford disputed the Government's contention that Dr. Hill's testimony would result in jury confusion because of the different mens rea elements in the crimes charged. (Id. at 27/21-23; 28/19-21). According to Mr. Wilford, specific intent is an element of both the conspiracy offense charged in Count One of the Indictment

and the substantive offense charged in Court Two of the
Indictment.  (Id. at 28/1-5 ("The government's position is
[that] the substan[tive] crime is not a specific intent
crime, and we don't accept that as being valid.  We think
that the proof that they have to establish is that it was
[Dr. Sabir's] intent specifically to provide material
support to [a]l-Qaeda . . . .")).


2.   Mr. Kohlmann's Proffered Expert Testimony

     On February 23, 2007, the Government provided notice
pursuant to Rule 16(a)(1)(G) of the Federal Rules of
Criminal Procedure of its intention to call Mr. Kohlmann at
trial.  (Kohlmann Notice at 1).[5]  The Government disclosed
that Mr. Kohlmann "will testify about the following general
subject matters": (1) "[t]he origins and history of the al
Qaeda terrorist organization;" (2) "[t]he structure and
leadership of al Qaeda;" (3) "[a]l Qaeda terrorist training
camps, instructional methods, and operational logistics;"
(4) "[s]pecific acts of terrorism perpetrated by al Qaeda,
including acts of terrorism in Saudi Arabia;" and

---

[5] "Kohlmann Notice" refers to Mr. Metzner's letter to Mr.
Wilford, counsel for Mr. Shah, and counsel for Mr. Brent,
dated February 23, 2007.

(5) "Azzam Publications, producers of jihadi videos such as 'Martyrs of Bosnia.'"  (Id. at 1-2).

On April 17, 2007, Dr. Sabir filed a motion in limine to preclude Mr. Kohlmann's testimony and, alternatively, to limit the scope of his testimony.  (Kohlmann Opp'n Mem. at 2).[6]  At the outset, Mr. Wilford contended that Mr. Kohlmann's proffered testimony failed to satisfy the requirements of Rule 702 of the Federal Rules of Evidence. First, Mr. Wilford asserted that Mr. Kohlmann's proffered testimony is not "based upon sufficient facts or data" because it has merely been "culled from a handful of cases and a series of internet reports."  (Id. at 2).  Second, Mr. Wilford claimed that Mr. Kohlmann's proffered testimony is not "the product of reliable principles and methods" because he "places great emphasis on the so-called statements of Mujahideen on the internet or during interrogation" and "there is no evidence that . . . [they] are true or what they are based upon or the conditions under which the statements were made."  (Id.).  Third, Mr. Wilford contended that Mr. Kohlmann has not "applied the principles and methods reliably to the facts of the case" because he has not "ascertain[ed] whether Dr. Rafiq Sabir

_____

[6] "Kohlmann Opp'n Mem." refers to Mr. Wilford's letter to the Court dated April 17, 2007.

8

was even aware of the items proposed to be testified about."  (Id.).

Assuming the Court qualified Mr. Kohlmann as an expert, Mr. Wilford asserted that certain topics should not be included within his testimony.  (Id. at 2-3).  For instance, Mr. Wilford stated that expert opinion about the "structure and leadership" of al-Qaeda is unnecessary and its leader, Usama bin Laden, "is known to the layperson." (Id. at 3).  Mr. Wilford further contended that Mr. Kohlmann's "proffered testimony with respect to terrorist training camps, instructional methods and operational logistics is irrelevant as to Dr. Sabir," although it may be relevant to one of his charged co-conspirators, Tarik Shah.  (Id.).  In addition, according to Mr. Wilford, Mr. Kohlmann's proffered expert testimony about "specific acts of terrorism in Saudi Arabia is speculative unverified information based on propaganda from the internet."  (Id.). Finally, Mr. Wilford asserted that Mr. Kohlmann's "proffered testimony with respect to Azzam Publications is irrelevant as to Dr. Sabir and any discussion of a video entitled 'Martyrs of Bosnia' is clearly unrelated to the issues in this case and . . . its prejudicial impact outweighs [its] probative value."  (Id.).

On April 18, 2007, the Government produced Mr. Kohlmann's expert report and submitted the transcript of his hearing on November 2, 2005 in <u>United States v. Paracha</u>, No. 03 Cr. 1197 (S.D.N.Y.), pursuant to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 591–92 (1993).   (Kohlmann Reply Mem. at 2, 7 n.3).[7]   The Government also explained the relationship between Mr. Kohlmann's proffered testimony and the proof it expects to adduce at trial.

According to the Government, its "proof will include extensive audio recordings of conversations involving coconspirator Tarik Shah, first with a cooperating witness and later with an FBI undercover agent."   (<u>Id.</u> at 2). During these conversations, "Shah . . . repeatedly refers to his longtime friend, 'the doctor,' who shares his views and is likewise interested in assisting Muslim fundamentalist extremist fighters."   (<u>Id.</u>).   In addition, the Government's proof is expected to include evidence of a May 20, 2005 meeting between the FBI undercover agent, Tarik Shah, and Dr. Sabir, during which Dr. Sabir "took <u>bayat</u>, the al Qaeda pledge of fealty and obedience to Usama bin Laden and the organization."   (<u>Id.</u>).   At that meeting,

---

[7] "Kohlmann Reply Mem." refers to Mr. Metzner's letter to the Court dated April 18, 2007.

the Government proffers that Dr. Sabir "noted his then-current employment with a hospital in Riyadh, Saudi Arabia, his plans to return there shortly, and his willingness to aid wounded terrorists who would come to him for aid." (Id.).  Finally, the Government intends to introduce "[m]aterials recovered from searches [that] will corroborate [Dr. Sabir's] intent, as expressed to the undercover agent, to provide support to the al Qaeda terrorist organization."  (Id.).

The Government asserted that Mr. Kohlmann's proffered testimony concerning the history, structure, organization, membership, and operation of al Qaeda is relevant because, "[a]s in any 'sting' case, the Government needs to explain the role assumed by the undercover agent and how it relates to the real-life organization being mimicked."  (Id.). Since "[Tarik] Shah and [Dr.] Sabir have substantial knowledge of al Qaeda and its functioning, . . . the undercover agent did not need to go into such details with them," and thus, according to the Government, "the recordings alone will not provide that information to the jury." (Id. at 3).

The Government also contended that Mr. Kohllman's proffered testimony about al Qaeda's terrorist operations in Saudi Arabia is relevant because Dr. Sabir "had, for

11

several years, worked as a doctor at [a] hospital in Riyadh, Saudi Arabia" and "the evidence will show that [he] planned to return to Riyadh for another two-year term at the hospital shortly after the May 20, 2005, meeting with the undercover agent." (Id.).   The Government asserts that "[t]he jury is entitled to infer, given [Dr.] Sabir's longtime residence in Saudi Arabia, that he was aware of the terrorist acts carried out by al Qaeda within that country, particularly against American citizens."   (Id.).

Finally, the Government claimed that Mr. Kohlmann's proffered testimony about the "Martyrs of Bosnia" videotape published by Azzam Publications, although recovered during a search of Tarik Shah's residence, is relevant to proving Dr. Sabir's intent to provide material support or resources to al Qaeda.  (Id. at 4).  According to the Government, "[e]vidence of the extremist nature of the information found in their possession is relevant to proving that intent."  (Id.).

DISCUSSION

1.   Legal Standard for Expert Evidence

Under Rule 702 of the Federal Rules of Evidence, an expert may testify in the form of an opinion, if his or her "scientific, technical, or other specialized knowledge will

assist the trier of fact to understand the evidence or to determine a fact in issue." A district court determining whether to admit expert testimony under Rule 702 is required to conduct a two-step inquiry. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591-92 (1993). First, the court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93. Second, the court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact. Id.

In addition, "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone." Fed. R. Evid. 704(b). Moreover, to be admissible, proposed expert testimony must rest on a proper foundation. See Fed. R. Evid. 703 & 705.

Finally, like all evidence, expert testimony must be relevant such that it "make[s] the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  And, even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

2.   Legal Standard for Expert Mental State Evidence

The starting point in evaluating the proffered expert psychological evidence is the Insanity Defense Reform Act of 1984 (the "IDRA"), enacted in 1984.  Pub. L. No. 98-473, Title II, § 402(a), 98 Stat. 1837, 2057, § 20.  The IDRA reads, in relevant part: "It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.  Mental disease or defect does not otherwise constitute a defense." 18 U.S.C. § 17(a) (emphasis added).

In enacting this legislation, Congress sought to achieve several principal objectives, including: (1) the elimination of any form of legal excuse based on a defendant's lack of volitional control, (2) the preclusion

14

of defenses based on "diminished responsibility" and similar theories through which defendants had previously sought to excuse or justify their conduct by relying on evidence of a mental impairment, and (3) the reduction of dangers posed by expert testimony regarding inherently malleable psychological concepts, which could be misused to mislead and confuse juries in criminal cases.  See, e.g., United States v. Cameron, 907 F.2d 1051, 1061-62 (11th Cir. 1990).  The defenses eliminated by the IDRA include "diminished capacity," "diminished responsibility," "mitigation," and "justification."  See id. at 1061-62, 1066-67; United States v. Pohlot, 827 F.2d 889, 890, 905 (3d Cir. 1987).

However, the IDRA "does not preclude a defendant from submitting mental health evidence for the purpose of rebutting the prosecution's proof of the mens rea element of a specific intent crime."  United States v. Dupre, 462 F.3d 131, 137 (2d Cir. 2006).  Nevertheless, such evidence is permitted only in rare and narrowly defined circumstances because of the high likelihood that it will result in the resurrection of precisely the kinds of defenses that the IDRA was enacted to prohibit.  See, e.g., Cameron, 907 F.2d at 1066 ("Otherwise, the insanity defense will be improperly resurrected in the guise of showing some

other affirmative defense . . . which would serve to excuse
the offense and open the door, once again, to needlessly
confusing psychiatric evidence."); Pohlot, 827 F.2d at 905
(noting the "strong danger of misuse" in this area and
stating that "[n]otions of intent, purpose and
premeditation are malleable and at their margins
imprecise"); see also United States v. Childress, 58 F.3d
693, 730 (D.C. Cir. 1995) ("We share the concern that
evidence of general mental capacity not be used to persuade
a jury that a defendant is not responsible for his
deliberate and purposeful activity-this usage exceeds the
bounds of mens rea evidence.").

     Accordingly, in determining whether evidence of a
mental impairment is admissible for this purpose, a
defendant is required to demonstrate clearly, in advance of
trial, that there is a direct link between such evidence
and the specific mens rea that the Government must prove.
See United States v. Dupre, 339 F. Supp. 2d 534, 539
(S.D.N.Y. 2004) ("Given that defendants are not foreclosed
from presenting mental disease evidence towards the mens
rea element of a charged offense, it is necessary to
identify whether any elements of the charged offenses
require the Government to prove intent in a way that could
be meaningfully refuted by the type of mental disease

evidence [the defendant] seeks to present."), aff'd, 462
F.3d 131, 137 (2d Cir. 2006); United States v. Brown, 326
F.3d 1143, 1147 (10th Cir. 2003) ("The admission of such
evidence will depend upon whether the defendant clearly
demonstrates how such evidence would negate intent rather
than 'merely present a dangerously confusing theory of
defense more akin to justification and excuse.'") (quoting
Cameron, 907 F.2d at 1067); see also United States v.
Pirro, 76 F. Supp. 2d 478, 485 (S.D.N.Y. 1999) (stating
that "[m]ental disease evidence is generally excluded where
no link is demonstrated between the evidence and the
defendant's mens rea").

        "Conclusory statements by a defendant about the link
between psychiatric evidence and the defendant's mens rea
at the time the alleged crime was committed do not render
the evidence admissible." United States v. Baxt, 74 F.
Supp. 2d. 436, 440 (D.N.J. 1999) (citing United States v.
Bennett, 161 F.3d 171, 181, 185 (3d Cir. 1998)); see also
United States v. Pelletiere, 101 F.3d 685, Nos. 95-1328,
95-1618, 1996 WL 282142, at *1 (2d Cir. May 29, 1996)
(affirming the district court's exclusion of defendant's
psychiatric evidence which "purported to relate to the
issue of intent," because the proffered expert testimony
was conclusory and "fail[ed] to show how [the defendant's]

17

alleged mental disorders affected her ability to form an intent to defraud" members of the public) (unpublished decision).

Moreover, "[t]his burden of showing that proffered testimony is offered to negate the mens rea element of a crime and not in support of some improper defense theory falls squarely on the defendant." Baxt, 74 F. Supp. 2d at 441 (citing United States v. Williams, 95 F.3d 723, 729 (8th Cir. 1996)); see also Daubert v. Merrell Dow Pharmaceuticals, 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand, holding that proponent of expert testimony must show that evidence is admissible under standards set forth in the Supreme Court's decision); United States v. Starzecpyzel, 880 F. Supp. 1027, 1031 (S.D.N.Y. 1995) (stating that the proponent of expert evidence bears the burden of producing facts to establish admissibility).

Thus, it is not enough for a defendant to show that his psychiatric condition adversely affected his state of mind during the relevant time period or that his disorder caused him to commit the actions that form the basis of a charge. See, e.g., United States v. Mezvinsky, 206 F. Supp. 2d 661, 672-73 (E.D. Pa. 2002) ("To be sure, [the defendant's] experts are prepared to testify at length that [his bipolar disorder] resulted in 'poor judgment' and 'bad

choices,' but none is in a position to state that, at the
relevant time, [he] did not have the capacity to
deceive."); United States v. Agnello, 158 F. Supp. 2d 285,
288 (E.D.N.Y. 2001) ("That the defendant, for whatever
reason, was 'racing' or 'speeding up' says nothing about
his intent to commit crimes.  The mere fact, if it is a
fact, that these problems are 'classically identified with
his illness [of bipolar disorder]' does not mean that the
problems have anything to do with his intent.  At most,
they may suggest a lack of ability to control himself.");
United States v. Pendergraft, 120 F. Supp. 2d 1339, 1344
(M.D. Fla. 2000) ("Defendant's behaviors of self
aggrandizement, a desire to ingratiate himself to others
and his fear to the point of paranoia are not behaviors
that demonstrate Defendant did not know that he was
submitting a false affidavit to the Court or to the F.B.I.
or that the affidavit was submitted to extort a settlement
for his benefit."); Baxt, 74 F. Supp. 2d. at 441-42 ("That
[the defendant] may have been overcome by certain passions
that are the product of his mental illness . . . does not
demonstrate that [he] did not know that the financial
statements he submitted to Summit Trust were false.
Likewise, it does not show that [he] did not intend to
influence the actions of Summit Trust when he submitted

false statements to it in February and May, 1989."); United States v. Towns, 19 F. Supp. 2d 67, 71-72 (W.D.N.Y. 1998) (excluding certain evidence of the defendant's disorders because such testimony was "relevant more to the issue of what might have incited and stimulated [the defendant] to form the intent to execute a chain of events [leading to her involvement in an attempted bank robbery] . . . than to the actual issue of whether or not [the defendant] intended to execute those events"); United States v. Griffin, No. 94 Cr. 631, 1996 WL 140073, at *10 (S.D.N.Y. Mar. 27, 1996) ("This conclusion [that the defendant could be easily controlled and readily influenced by certain individuals] presents a form of 'volitional control' defense based on [the defendant's] alleged inability to conform his conduct to the requirements of the law, the type of insanity defense that was specifically excluded by [18 U.S.C. §] 17(a).").

Even if the proffered psychological testimony has some relevance to the issue of mens rea, it may be excluded for failing the test of admissibility under Rule 403. Such evidence "presents an inherent danger that it will distract the jury[] from focusing on the actual presence or absence of mens rea." Cameron, 907 F.2d at 1067. As the Third

Circuit cautioned in <u>Pohlot</u>:

> Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires.

827 F.2d at 890. For these reasons, such evidence, even if relevant and helpful under Rules 401 and 702, is excluded under Rule 403 where its capacity to mislead and confuse the jury substantially outweighs whatever limited probative value it may have. <u>See, e.g.</u>, <u>Dupre</u>, 462 F.3d at 138 (affirming the district court's exclusion of expert testimony under Rule 403 because the psychological evidence that the defendant's pervasive religious beliefs interfered with her ability to form the required intent for the charged fraud offenses was, <u>inter alia</u>, likely to confuse and mislead the jury); <u>United States v. Schneider</u>, 111 F.3d 197, 202-03 (1st Cir. 1997) (affirming the district court's exclusion of expert testimony showing the defendant had "impaired" judgment under Rule 403 because it "could easily mislead the jury into thinking that such a medical condition amounts to temporary insanity or ameliorates the offense"); <u>see also</u> <u>Mezvinsky</u>, 206 F. Supp. 2d at 674 ("To the extent [defendant's] proffered testimony as to his bipolar condition might slip through a crack in the <u>Pohlot</u>

door, it simply cannot do so through the Rule 403 door given the very high likelihood of its misleading the jury into forbidden territory.").

3.  Legal Standard for Terrorist Organization Expert Testimony

The Court of Appeals has permitted expert testimony concerning the organization and operations of organized crime families, including the identification of key leaders and members of those families.  See United States v. Amuso, 21 F.3d 1251, 1263-64 (2d Cir. 1994) (affirming the admission of expert testimony "regarding the organization, structure, and terminology of organized crime families"); United States v. Locascio, 6 F.3d 924, 936-37 (2d Cir. 1993) (affirming the admission of expert testimony "at great length on the nature and function of organized crime families, imparting the structure of such families and disclosing the 'rules' of La Cosa Nostra").[8]

---

[8] See also United States v. Gotti, No. 02 Cr. 743, 2004 WL 2423799, at *1-*2 (S.D.N.Y. Oct. 29, 2004) (permitting expert testimony in a number of areas, including the structure of organized crime families, rules of conduct, methods of controlling businesses and the identities of specific members of organized crime families); United States v. Lombardozzi, No. 02 Cr. 273, 2003 WL 1907965, at *4 (S.D.N.Y. Apr. 17, 2003) (permitting expert testimony that the defendant was a "made member of the Gambino Family" and on "how disputes between members of different [La Cosa Nostra] families are resolved").

In Amuso, the Court of Appeals explained that the
rationale for permitting such expert testimony is that
"[a]side from the probability that the depiction of
organized crime in movies and television is misleading, the
fact remains that the operational methods of organized
crime families are still beyond the knowledge of the
average citizen."  21 F.3d at 1264.  Thus, the Court of
Appeals concluded that "[d]espite the prevalence of
organized crime stories in the news and popular media,
these topics remain proper subjects of expert testimony."
Id.

Beyond the organized crime context, courts have
allowed similar expert testimony concerning the history,
structure, organization, membership, and operation of
terrorist organizations.  For example, in a prosecution of
an individual accused of providing material support to the
Hizballah foreign terrorist organization by soliciting
donations at a weekly prayer service and forwarding the
money to a senior Hizballah military commander, the Fourth
Circuit affirmed the admission of expert testimony
concerning Hizballah.  See United States v. Hammoud, 381
F.3d 316, 337 (4th Cir. 2004) (affirming defendant's
conviction) (en banc), vacated on other grounds, 543 U.S.
1097 (2005), reinstated in relevant part, 405 F.3d 1034

(4th Cir. 2005) (en banc).  According to the Fourth
Circuit, the expert testimony "regarding the structure of
Hizballah," identifying its leaders, "explain[ing] the
significance of [the defendant's] contact with those
leaders," and the discussion of "the nature of Hizballah's
funding activities with specific reference to the
[defendant's] activities," was "critical in helping the
jury understand the issues before it."  381 F.3d at 337.

Indeed, in a recent trial in this District in United
States v. Paracha, No. 03 Cr. 1197, 2006 WL 12768, at *21
(S.D.N.Y. Jan. 3, 2006), which, like this case, involved
allegations of conspiracy and attempt to provide material
support or resources to al Qaeda, Judge Sidney H. Stein
admitted expert testimony "regarding al Qaeda's origin,
leadership, and operational structure, as such testimony
[would] aid the jury in understanding how al Qaeda came to
be and the manner in which it currently functions."  Judge
Stein explained further that such testimony would "assist
the jury in understanding the nature and functioning of the
organization [the defendant] is alleged to have assisted."
Id.  In so ruling, Judge Stein rejected the same argument
put forth here by Mr. Wilford, who also represented the
defendant in Paracha, that such testimony is unnecessary

because al Qaeda is known to the layperson:

> [E]xpert testimony about al Qaeda is
> appropriate despite its regular appearance
> in the popular media both because the
> media's depiction may be misleading and
> because some features of al Qaeda relevant
> to the allegations in this case remain
> "beyond the knowledge of the average
> citizen."

Id. at *22 (quoting Amuso, 21 F.3d at 1264).

Moreover, Judge Stein determined that Mr. Kohlmann, the Government's expert here, was qualified to give such expert testimony.  Id. at *20-*21.  In particular, Judge Stein found that Mr. Kohlmann "possesses sufficient education, training and experience to qualify as an expert on the origins, leadership and tradecraft of the al Qaeda organization."  Id. at *20.[9]  In so concluding, Judge Stein rejected the same argument made by Mr. Wilford in this case that Mr. Kohlmann's methodology is unreliable:

> Although [Mr.] Kohlmann's methodology is not
> readily subject to testing and permits of no
> ready calculation of a concrete error rate,
> it is more reliable than a simple cherry-
> picking of information from websites and
> other sources.  The testimony and evidence
> at the [Daubert] hearing demonstrate that

---

[9] As noted earlier (see supra at 10), Judge Stein reached this conclusion after, in response to a similar motion in limine filed by Mr. Wilford, holding a hearing to make a "preliminary assessment of whether the reasoning or methodology underlying [Mr. Kohlmann's] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Id. at *18 (quoting Daubert, 509 U.S. at 592-93).

> [Mr.] Kohlmann's opinions and conclusions
> are subjected to various forms of peer
> review and that the opinions he proposes to
> offer here regarding al Qaeda's origins,
> leaders and certain tradecraft are generally
> accepted within the relevant community.
> [Mr.] Kohlmann's methodology, as he
> describes it, is similar to that employed by
> experts that have been permitted to testify
> in other federal cases involving terrorist
> organizations.

Id. (citations omitted); see also Hammoud, 381 F.3d at 337

(holding that the district court did not abuse its

discretion in qualifying an individual as an expert who

employed a similar "methodology . . . generally employed in

the social sciences").

Finally, Judge Stein rejected the same argument

submitted by Mr. Wilford in this case challenging Mr.

Kohlmann's reliance on hearsay materials:

> The [G]overnment correctly counters that
> expert witnesses may testify to opinions
> based on hearsay or other inadmissible
> evidence where experts in that field
> reasonably rely on such evidence in forming
> their opinions.  Although [Mr.] Kohlmann
> does collect original materials from the
> groups he studies, similarly to law
> enforcement officers who offer expert
> testimony on the workings of criminal
> organizations, . . . [Mr.] Kohlmann also
> necessarily relies on secondary sources to
> form his opinions about secretive terrorist
> organizations.  His use of such sources is
> permissible.

Id. at *21 (citations omitted); see also United States v.

Damrah, 412 F.3d 618, 625 (6th Cir. 2005) (holding that the

26

district court did not abuse its discretion in allowing expert testimony based on, <u>inter alia</u>, books, press releases, and newspaper articles and quoting the district court's opinion that "[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon").

4.  <u>Application to Dr. Hill's Proffered Testimony</u>

The latest iteration of Dr. Hill's proffered testimony does not claim that Dr. Sabir has some type of mental disease or defect which affected his ability to form the requisite intent.  Thus, it is of no relevance to the jury.  Instead, although characterized by counsel as an "explanation," Dr. Hill's testimony is being offered merely to excuse or justify Dr. Sabir's conduct.  As such, it is not proper.  Indeed, the testimony proposed is exactly what the IDRA was enacted to prevent.

Even if Dr. Hill's proffered testimony was relevant, it would be excluded under Rule 403 as misleading and confusing to the jury.  First, the proffered testimony would serve merely to distract the jury's attention from considering the evidence as it applies to the elements of the crimes charged.  Instead, this evidence would suggest that the jurors should have sympathy for Dr. Sabir because

of his troubled childhood and would implicitly encourage
them to nullify by acquitting him based on something other
than the question of whether the Government has proved each
element of the crimes charged beyond a reasonable doubt.

Second, if Dr. Hill were to testify that Dr. Sabir was
unable to "formulate the intent necessary to provide
material support to [a]l Qaeda" (see supra at 3), it would
lead to jury confusion because intent is not an element of
both crimes charged.  Count One of the Indictment charges
Dr. Sabir with participating in a conspiracy in violation
of 18 U.S.C. § 2339B.  It is black letter law that "[a]n
essential element of conspiracy is that the defendant
knowingly, willfully, and unlawfully became a member of the
conspiracy.  Thus, the Government must prove that [Dr.
Sabir] joined the conspiracy with an awareness of its
illegal aim and purpose and with the specific intent of
furthering that purpose." Dupre, 339 F. Supp. 2d at 540
(citing United States v. Downing, 297 F.3d 52, 57 (2d Cir.
2002)).

Count Two of the Indictment charges Dr. Sabir with the
substantive offense of attempting to violate 18 U.S.C.
§ 2339B.  "Section 2339B – enacted two years after section
2339A – plainly excludes the explicit mens rea requirement
to further illegal activities, and the legislative history

indicates that this exclusion was purposeful." Paracha, 2006 WL 12768, at *28.  Moreover, Congress amended the statute in December 2004 to incorporate the following specific mens rea requirement: "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism."  18 U.S.C. § 2339B(a)(1); see also Strauss v. Credit Lyonnais, S.A., No. 06 Civ. 0702, 2006 WL 2862704, at *13 (E.D.N.Y. Oct. 5, 2006) (stating that 18 U.S.C. § 2339B "makes no mention of an intent to further the [foreign terrorist] organization's goals").

     Based on the statute's text, to sustain a conviction on Count Two of the Indictment, the Government is not required to prove beyond a reasonable doubt that Dr. Sabir intended to further the illegal activities of al Qaeda. See Paracha, 2006 WL 12768, at *30 ("Because it is neither required by the constitution nor consistent with the statutory text, the jury will not be instructed that the government must prove . . . that he intended to further the unlawful activities of the al Qaeda entity."); see also United States v. Aref, No. 04 Cr. 402, 2007 WL 603508, at *25 (N.D.N.Y. Feb. 22, 2007) (rejecting defendant's post-

trial motions for a judgment of acquittal or a new trial:
"whether [the defendant] agreed with the goals of the
[foreign terrorist organizations] is not the issue, but
instead whether he knowingly and intentionally provided
material support or resources to a group he knew was a
foreign terrorist organization"). Instead, with respect to
Count Two of the Indictment, the Government must prove that
in attempting to provide material support or resources to
al Qaeda, Dr. Sabir did so "knowingly," meaning that "[Dr.
Sabir] acted voluntarily and intentionally and not because
of mistake or accident" and that "[Dr. Sabir] knew that al
Qaeda had been designated by the Secretary of State as a
'foreign terrorist organization' or that he knew that it
had conducted or engaged in 'terrorist activity.'"
Paracha, 2006 WL 12768, at *31.[10]

---

[10] At a conference on April 23, 2007, the Court heard oral
argument on the proposed jury instruction with respect to
Count Two of the Indictment and, specifically, the mens rea
required to establish a substantive violation of 18 U.S.C.
§ 2339B. (Transcript of Oral Argument, dated April 23,
2007, at 13-11/23-8 & 27/4-36/8). Mr. Wilford conceded
that the weight of the case law described above did not
support the engrafting on to the statute of a heightened
scienter element requiring the Government to prove that Dr.
Sabir attempted to provide material support or resources
specifically intending to further the goals of al Qaeda.
(Id. at 13/20-23; 18/10-11; 19/14-20/4; 20/18-25).
Nevertheless, Mr. Wilford contended that the Court should
instruct the jury that the Government "must prove that [Dr.
Sabir] acted knowing that what he was [attempting to]
                                        (continued)

Thus, even if Dr. Hill's testimony had some probative value, it would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its tendency to mislead the jury.  Accordingly, Dr. Hill's testimony is excluded.

---

(continued)

provid[e] would or could further the interests of al Qaeda as an organization and not simply the personal interests of its individual members." (<u>Id.</u> at 16/21-17/8 (quoting <u>Paracha</u>, 2006 WL 12768, at *31)).  Mr. Metzner noted that the Government objected to that portion of Judge Stein's jury instruction in <u>Paracha</u>.  (<u>Id.</u> at 22/1-5).  Nevertheless, Mr. Metzner stated that this portion of the instruction in <u>Paracha</u> "was arguably appropriate" because of the "taxi driver problem."  (<u>Id.</u> at 22/6-8).  The "taxi driver problem" describes the situation where an individual, such as a taxi driver, would not run afoul of the material support statute at issue if his assistance, in driving a member of a foreign terrorist organization to an airport, for instance, was found to be assistance merely to an individual, not said organization.  (<u>Id.</u> at 22/8-20).  According to Mr. Metzner, the "taxi driver problem" was present in <u>Paracha</u> because "[t]he defense argument was that in fact [the defendant] was simply helping out a friend[,] rather than helping out the [a]l Qaeda terrorist organization" to get travel documents to enter the United States.  (<u>Id.</u> at 27/15-19).  Here, however, the "taxi driver problem" does not exist because Dr. Sabir is not being charged with attempting to provide medical support or resources to a single, specific member of al Qaeda but, rather, with attempting to provide "medical support to wounded jihadists" generally in Saudi Arabia.  (<u>Id.</u> at 28/19-25).  Thus, based on the proffers to date of the Government's proof at trial, the jury will not be instructed on the additional <u>mens rea</u> requirement sought by Dr. Sabir.  (<u>Id.</u> at 35/20-36/5).

5.   <u>Application to Mr. Kohlmann's Proffered Testimony</u>

As discussed earlier, Dr. Sabir did not request that the Court hold a hearing to make a "preliminary assessment of whether the reasoning or methodology underlying [Mr. Kohlmann's] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  <u>Daubert</u>, 509 U.S. at 592-93.  Nevertheless, the Court has conducted an independent review of Mr. Kohlmann's <u>curriculum</u> <u>vitae</u> and the transcript from the <u>Daubert</u> hearing held in <u>Paracha</u>.  (<u>See</u> <u>supra</u> at 10).  The Court also takes judicial notice of the fact that, since <u>Paracha</u>, Mr. Kohlmann has provided expert testimony in at least two other federal criminal cases involving allegations of material support or resources for terrorism or terrorist organizations.  <u>See</u> <u>Aref</u>, 2007 WL 603508, at *4, *16 (rejecting defendant's post-conviction challenge to the admissibility of Mr. Kohlmann's testimony on political groups in Bangladesh and their ideologies and stating that the argument was "raised and rejected at trial"); <u>United States v. Chandia</u>, No. 05 Cr. 401 (E.D. Va. Apr. 21, 2006) (Order entered denying defendant's motion to exclude the Mr. Kohlmann's testimony).  For the same reasons set forth in detail by Judge Stein in <u>Paracha</u>, 2006 WL 12768, at *18-*22, the Court finds that Mr. Kohlmann is

qualified as an expert to provide testimony on the subjects discussed herein.

Mr. Kohlmann's proffered testimony will assist the jury in understanding the evidence in this case.  For instance, the Government is correct that testimony regarding the history, structure, organization, membership, and operation of al Qaeda "will give the jury an important overview of al Qaeda, so that the members of the jury will have at least a working knowledge of what al Qaeda is, and therefore, will be able to place the undercover agent's actions and statements in their proper context, and evaluate the gravity of [Dr. Sabir's] conduct in dealing with a person [he] believed to be working for Usama bin Laden." (Kohlmann Reply Mem. at 6).  Similarly, although Mr. Wilford disputed the relevancy of the "Martyrs of Bosnia" videotape published by Azzam Publications, he conceded that it is "not something that a normal juror is going to understand or have any idea of." (Transcript of Oral Argument, dated April 20, 2007, at 36/3-12).

Mr. Kohlmann's proffered testimony will also assist the jury in determining facts in issue.  For example, it will assist them in determining whether the Government has proven that Dr. Sabir provided material support or resources to al Qaeda with "knowledge that [it] is a

33

designated terrorist organization . . . that [it] has
engaged or engages in terrorist activity . . . , or that
[it] has engaged or engages in terrorism."  18 U.S.C.
§ 2339B(a)(1).  In addition, testimony regarding al Qaeda's
terrorist acts in Saudi Arabia and the extent to which they
were known by people living in, and traveling to and from
Saudi Arabia, such as Dr. Sabir, will also permit the jury
to infer that, as characterized by the Government, "when
the undercover agent, aware of [Dr.] Sabir's employment in
[Saudi Arabia], refers to al Qaeda's need for doctors to
treat wounded terrorists, [Dr.] Sabir's acceptance of that
responsibility reflects a knowing and intentional provision
of assistance to al Qaeda in a concrete and measurable
fashion."  ((Kohlmann Reply Mem. at 3-4).  Moreover, as
noted earlier, although the "Martyrs of Bosnia" videotape
was recovered during a search of Tarik Shah's residence,
not Dr. Sabir's home, the jury could infer that, as stated
by the Government, "[e]vidence of the extremist nature of
the information found in [a co-conspirator's] possession is
relevant to proving" Dr. Sabir's intent to provide material
support or resources to al Qaeda.  (Id. at 4).

     Accordingly, Mr. Kohlmann's expert testimony on the
above topics is permitted.

## CONCLUSION

For the reasons set forth above, Dr. Sabir's motions _in limine_ [dkt. nos. 107, 125, & 127] to introduce psychological expert testimony and to preclude terrorist organization expert testimony are denied.

SO ORDERED:

Dated: New York, New York
       May 9, 2007

LORETTA A. PRESKA, U.S.D.J.