UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
─────────────────────────────────
UNITED STATES OF AMERICA,

         -versus-                        05-CR-673 (LAP)

RAFIQ SABIR,                                 ORDER

              Defendant.
─────────────────────────────────
```

LORETTA A. PRESKA, SENIOR UNITED STATES DISTRICT JUDGE:

Before the Court is Defendant Rafiq Sabir's motion for
early release pursuant to 18 U.S.C. section 3582(c) based on the
COVID-19 pandemic.  (Dkt. no. 260.)  For the reasons set out
below, the motion is denied.

**I. Procedural History**

Superseding Indictment S4 05 Cr. 673 (LAP) was filed
against Sabir and three others on December 6, 2006, charging
Sabir in two counts with conspiring to provide, and attempting
to provide, material support to al Qaeda, in violation of 18
U.S.C. § 2339B.  Trial commenced on April 27, 2007 and ended on
May 21, 2007, when Sabir was convicted on both counts.  On
November 28, 2007, Sabir was sentenced principally to 300
months' imprisonment.

Sabir appealed his conviction, and in an opinion dated
February 4, 2011, the Court of Appeals rejected all of Sabir's
claims and affirmed his conviction.  United States v. Farhane,

634 F.3d 127 (2d Cir. 2011).  Sabir then moved for rehearing and
rehearing en banc, which was denied by the Court of Appeals on
May 12, 2011.  Finally, Sabir sought a writ of certiorari in the
United States Supreme Court, which was denied on December 5,
2011.  Sabir filed a motion under 28 U.S.C. § 2255 on November
30, 2012.  The Government filed its initial opposition to
Sabir's motion on April 13, 2013. (Crim. Dkt. 193).

After filing his initial Section 2255 motion, Sabir
subsequently retained counsel, who filed a supplemental
memorandum in support of the motion on September 13, 2016.  The
Government responded on July 23, 2017.

According to the Bureau of Prisons, Sabir's current
estimated release date is January 22, 2027.  He has been in
custody since his arrest in May 2005, so he has served just over
15 years, with approximately 6 more years to serve assuming his
continued accretion of good-time credits.

**II. Factual Background**

A. Sabir's Offense Conduct

Rafiq Sabir conspired with his long-time friend, Tarik
Shah, to support the al Qaeda terrorist organization by
providing martial arts training to its terrorists and medical
services to its wounded fighters and also attempted to provide
that support.  The culmination of Sabir and Shah's conspiracy to
provide material support to al Qaeda was a meeting with an

2

undercover agent posing as an al Qaeda recruiter, in which Sabir swore bayat--an oath of allegiance--to al Qaeda and Osama bin Laden.

Shah and Sabir both subscribed to a militant form of Islam for many years before trying to join al Qaeda and assist its jihad mission.  The investigation also employed a confidential informant, who became close to Shah in the course of taking bass lessons, and recorded hours of conversation in which Shah discussed his and Sabir's views and plans to train potential mujahideen in deadly martial arts techniques, among other things.  Shah expressed to the confidential informant that he was interested in obtaining a warehouse space to conduct his martial arts training and even visited a potential site for this purpose.  To start the next phase of the investigation, the FBI introduced an undercover agent--FBI Special Agent Ali Soufan--to pose as an al Qaeda recruiter.  Shah indicated to Soufan, among other things, that he and Sabir would both be very interested in meeting the recruiter and that they came together as a "pair." Shah also emphasized his own skills in providing martial arts training and Sabir's skills as a medical doctor with training in emergency medicine.

After additional meetings, Soufan, Shah, and Sabir met on May 20, 2005.  When Sabir expressed interest in meeting mujahideen brothers in Saudi Arabia, where he had been working

as a doctor and to where he was scheduled to return shortly, Soufan probed further to make sure that Sabir understood that the agent was talking about al Qaeda.  Later in the meeting, after giving Sabir numerous opportunities to back out, Soufan offered to take bayat from Sabir and Shah, wherein they would pledge an oath to al Qaeda and Osama bin Laden.  First Shah and then Sabir took the oath, which Soufan administered in both English and Arabic.  Sabir also provided his mobile phone number to Soufan--using a code--so that any al Qaeda mujahideen fighters who needed medical assistance in Saudi Arabia could contact him once he returned there.

B. Sabir's Medical History

In his sworn statement (dkt. no. 261, Ex. C), Sabir states that, for many years, he has suffered from "asthmatic symptoms in spates associated with influenza-like illness several times a year," for which he has been prescribed an albuterol inhaler that he uses periodically as necessary. (Id. at 1.)  He has been diagnosed with hypertension and has been prescribed Lisinopril. (Id. at 2.)  Since 2018, Sabir reports, his blood pressure has fluctuated between normal and moderate hypertension, with no further medical prescriptions or recommendations other than a low sodium diet.  (Id.)  Sabir has also been diagnosed as "prediabetic," in light of elevated hemoglobin A1C and glucose test results.

In November 2019, Sabir was found to have an elevated PSA result and in May 2020, received an MRI from an outside medical provider.  That MRI identified a lesion on Sabir's prostate measuring 1.5 by 1.4 centimeters, which the radiologist assigned a PI-RADS score of 5, which translates to a "very high likelihood of clinically significant cancer."  (Dkt. 261, Ex. D at 2—4.)

Additional BOP records reflect that Loretto FCI staff recommended on June 4, 2020, that Sabir be transferred to a Federal Medical Center for assessment and possible treatment of his likely prostate cancer.  However, because of restrictions on inmate movement occasioned by the COVID-19 pandemic, BOP officials did not approve a transfer.  On June 30, 2020, Sabir received another consultation with an outside provider near Loretto FCI.  That provider recommended, as had an earlier provider, that Sabir receive a biopsy to diagnose his potential prostate cancer.  So far as the parties have informed the Court, Sabir has not yet received a biopsy, although BOP is seeking to expedite it depending on the availability of an outside provider.

    C. Sabir's Administrative Requests for
       Compassionate Release

On March 2 and 7, 2020, Sabir filed motions with the Bureau of Prisons seeking a reduction in sentence.  On April 3, 2020, he filed a application for compassionate release, all attached

as Exhibit B to his moving memorandum of law.  (Dkt. no.
261.)  So far as the parties report, no action has been taken on
those motions.

    D. <u>Sabir's Present Motion</u>

    On or about June 25, 2020, Sabir, represented by counsel,
filed a motion asking this Court to modify his sentence to time
served and order his immediate release in light of what he
argued were the extraordinary and compelling reasons of the risk
to his safety posed by the COVID-19 pandemic.  Sabir relied on
his age--66 years old as of July 4--and several health
conditions, which he asserts place him at particularly high risk
for serious illness were he to become infected.

    Sabir's pending motion for a reduction in his sentence,
pursuant to 18 U.S.C. § 3582(c)(1)(A), relies on Application
Note 1(B) to Section 1B1.13 of the Sentencing Guidelines, which
provides that a defendant may be eligible for compassionate
release if "the defendant (i) is at least 65 years old; (ii) is
experiencing a serious deterioration in physical or mental
health because of the aging process; and (iii) has served at
least 10 years or 75 percent of his or her term of imprisonment,
whichever is less."  U.S.S.G. § 1B1.13, comment (n.1(B)).  In
support of the argument that Sabir "is experiencing a serious
deterioration in physical or mental health," the motion
reiterates the grounds that Sabir cited in his administrative

6

request, including "belatedly diagnosed prostate cancer;

hypertension; asthma/chronic lung disease; and high

cholesterol." (Dkt. no. 261 at 2, 5-7.)  Sabir's motion seeks

compassionate release based on the "extraordinary and compelling

circumstances" presented by the COVID-19 pandemic, arguing that

Sabir's medical conditions render him particularly vulnerable to

serious illness were he to become infected.  (Id. at 9-17.)

Lastly, Sabir argues that he would not pose a danger if released

and that the Section 3553(a) factors weigh in favor of his

motion.  (Id. at 17-19.)

### IV. Legal Framework

A court "may not modify a term of imprisonment once it has

been imposed except that":

> the court, upon motion of the Director of the Bureau
> of Prisons, or upon motion of the defendant after the
> defendant has fully exhausted all administrative
> rights to appeal a failure of the Bureau of Prisons to
> bring a motion on the defendant's behalf or the lapse
> of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is
> earlier, may reduce the term of imprisonment (and may
> impose a term of probation or supervised release with
> or without conditions that does not exceed the
> unserved portion of the original term of
> imprisonment), after considering the factors set forth
> in section 3553(a) to the extent that they are
> applicable, if it finds that--
>
> (i) extraordinary and compelling reasons warrant such
> a reduction;
>
> * * * *
>
> and that such a reduction is consistent with
> applicable policy statements issued by the Sentencing
> Commission.

18 U.S.C.A. § 3582(c)(1)(A).

The "applicable policy statements" referenced in the statute are found at Section 1B1.13 of the United States Sentencing Guidelines. Because the statute requires that a ruling concerning compassionate release be "consistent with applicable policy statements issued by the Sentencing Commission," 18 U.S.C. § 3582(c)(1)(A), Section 1B1.13 is binding on the Court. See Dillon v. United States, 560 U.S. 817, 826—27 (2010) (where Section 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).

Section 1B1.13 provides that a reduction of sentence is permitted if: (1) "extraordinary and compelling reasons warrant the reduction; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement."  U.S.S.G. § 1B1.13. As relevant here, the application notes provide that "extraordinary and compelling reasons" exist where the defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served

8

at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.  U.S.S.G. § 1B1.13, comment (n.1(B)).  Additionally, where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13, comment (n.1(D)).[1]

As this Court recently explained, when a defendant moves for early release under this provision,

> A district court's consideration of a compassionate release motion is guided by the policy statement within U.S. Sentencing Guidelines § 1B1.13.  See 18 U.S.C. § 3582(c)(1)(A).
>
> The Guidelines place two conditions on a determination of early release:
>
> (1) There are extraordinary and compelling reasons that warrant the reduction and
>
> (2) A situation where "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13. . . .

---

[1] While the Policy Statement pre-dates the First Step Act's procedural changes, the amendments to the compassionate release statute grant this Court the same discretion as that previously give[n] to the BOP Director, and therefore the Court may independently evaluate whether [a defendant] has raised an extraordinary and compelling reason for compassionate release" under the 'catch-all' provision.  ... Nonetheless, U.S.S.G. § 1B1.13's descriptions of 'extraordinary and compelling reasons,' ... provide helpful guidance for considering motions for compassionate release.

United States v. Olszewski, 2020 WL 2420483, at *2 (S.D.N.Y. May 12, 2020) (citations and internal quotation marks omitted).

When determining whether a prisoner is a danger to the community, section 1B1.13 refers to 18 U.S.C. § 3142(g), which in turn lists the following factors to be considered:

(1) the nature and circumstances of the offense charged ...;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person ... and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

If a prisoner presents extraordinary and compelling circumstances, and poses no danger to the community, the sentencing court "may reduce the term of imprisonment (and may impose a term of probation or supervised release with

or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A) (emphasis added).

As the proponent of the motion, the defendant bears the burden of proving "extraordinary and compelling reasons" exist under the above criteria to justify early release, that he is not a danger to the community, and that the Section 3553(a) factors and all other relevant considerations warrant the Court exercising its discretion to grant early release.  See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

United States v. Buziashvili, 2020 WL 3976936, at *1—*2

(S.D.N.Y. July 14, 2020).

## V.  Discussion

A. <u>Health Conditions</u>

The Court notes, and the Government acknowledges, that Sabir should certainly receive prompt attention on account of his likely prostate cancer.  That said, however, his health situation does not present "extraordinary and compelling reasons" warranting release.  As set out at length in the Government's papers (dkt. no. 263 at 15-19), the ailments Sabir mentions are well controlled and/or do not make him particularly vulnerable to serious illness from COVID-19.  His high blood pressure fluctuates in and our of the range for Stage 2 hypertension, and he stopped taking the drug prescribed for the condition because of a possible allergic reaction.  In any event, while the CDC lists pulmonary hypertension as a condition that "might" create an increased risk from COVID-19,[2] Sabir has not been diagnosed with that condition. (Dkt. no. 263 at 16-17.)

Although Sabir reports he has suffered from asthma for some years and has been prescribed an inhaler to use when necessary, his asthma is well controlled.  Indeed, during a recent quarantine, his lung function was observed to be normal.  (Dkt. no. 263 at 17-18).

---

[2]  CDC, "People with Certain Medical Conditions" (Aug. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions.

Sabir is apparently just within the range for prediabetes.  The standard treatment for that increased risk of diabetes, however, is diet modification and exercise--treatments easily accessible at a BOP facility.  (Dkt. no. 263 at 18.)

As the Government notes: "Although high cholesterol is a risk factor for heart disease, the CDC has not identified high cholesterol as putting a person at greater risk of severe illness from COVID-19," and "Sabir's medical records do not reflect a diagnosis of heart disease."  (Dkt. no. 263 at 18.)

With respect to Sabir's probable prostate cancer, as noted, diagnosis is not complete, and, of course, treatment has not begun.  While some treatments, such a chemotherapy, can impair a patient's immune system, it is speculation at this stage to guess what treatment, if any, will be prescribed, assuming a diagnosis of cancer.  Thus, based on all of Sabir's health conditions, the Court cannot find on this record that he has carried his burden of demonstrating "extraordinary and compelling reasons" warranting release.

B. Section 3553(a) Factors

Even if Sabir had demonstrated "extraordinary and compelling reasons" warranting release, the Court would find that the section 3553(a) factors mandate continued incarceration.  Regarding the nature and circumstances of the offense, this is, of course, a terrorism offense, and the

evidence against Sabir was very strong.  Before he swore bayat
or allegiance to Al Qaeda, the Al Qaeda recruiter taking the
pledge (actually an FBI agent) explained the nature of the
pledge (GX906T at 114), the importance of the pledge (Trial Tr.
1488), and that the pledge was to "Sheikh Osama," that is, Osama
bin Laden,  (id. at 1489-90, 2166).  Sabir is then heard
swearing allegiance to Sheikh Osama and giving his phone number
in code to the "recruiter."  Sabir was also heard bragging about
his ability to move around Saudi Arabia with "carte
blanche."  Clearly this was a serious offense where Sabir
pledged himself literally to give aid and comfort to enemies
fighting against our Nation.

Such a serious crime deserves serious punishment, and the
Guidelines prescribed a range of 360 months to life for
Sabir.  The Court, however, imposed 300 months, 60 months less
than the Guidelines called for.  Further decreasing the sentence
would, in the Court's view, go counter to the mandates that a
sentence should constitute just punishment for the offense and
should deter others from engaging in similar conduct.

The Court is also concerned with protecting the public from
further crimes of this Defendant.  He has argued that other
defendants who conspired to commit violent terrorist acts have
been released and, as part of his history and characteristics,
notes that he is 66 years old.  The Court observes, however,

13

that Sabir has never accepted responsibility for his offense or expressed one iota of remorse for it.  Also, whereas people tend to "age out" of certain violent crimes, this is a different situation.  As a doctor, Sabir can still easily give aid and comfort to the enemy, regardless of his age, and there is nothing in this record to indicate that he would not be inclined to continue to do so.  On balance, the Court finds that the 3553(a) factors mandate continued incarceration.

**VI.  Conclusion**

For the reasons set out above, Defendant's motion for release pursuant to 18 U.S.C. section 3582(c) (dkt. no. 260) is denied.

The Clerk of the Court shall mail a copy of this order to Defendant Sabir.

**SO ORDERED.**

Dated:  August 25, 2020
        New York, New York

_____
LORETTA A. PRESKA, U.S.D.J.

14